IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

GARY WAYNE BROWN,               )
    Petitioner,                 )        Civil Action No. 7:21cv00302
                                )
v.                              )
                                )        By:  Elizabeth K. Dillon
HAROLD W. CLARKE, DIRECTOR,     )             United States District Judge
    Respondent.                 )

**MEMORANDUM OPINION**

Gary Wayne Brown, a Virginia inmate proceeding *pro se,* has filed a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254, challenging his Smyth County Circuit Court

convictions for first-degree murder, abduction, conspiracy to commit abduction, and use of a

firearm in the commission of a felony, for which he was sentenced to 63 years in prison.

Respondent has filed a motion to dismiss, to which Brown has responded, and the matter is now

ripe for disposition.  After careful review of the record, the transcripts, the arguments of the

parties, and the applicable law, the court concludes that this petition must be dismissed for the

reasons stated below.

## I.  BACKGROUND

On October 22, 2012, an arrest warrant against Brown was issued for the first-degree

murder of Steven Williams earlier that day in Smyth County, Virginia.  Upon Brown's release

from the hospital in Johnson City, Tennessee, on October 29, 2013, Brown was arrested and held

without bond.  Allen Mathews, Jason Martin, and Helena Taylor were also charged in connection

with Williams' murder.  Following a preliminary hearing on April 9, 2013, the matter was

certified to the grand jury against all four defendants.  The grand jury issued indictments on June

25, 2013, charging all four defendants with murder in violation of Virginia Code § 18.2-32,

abduction in violation of Virginia Code § 18.2-47, use of a firearm while committing or attempting to commit a felony in violation of Virginia Code § 18.2-53.1, conspiracy to commit murder in violation of Virginia Code §§ 18.2-22 and 18.2-32, and conspiracy to commit abduction in violation of Virginia Code §§ 18.2-22 and 18.2-47.  Before Brown's case went to trial, each of Brown's co-defendants entered guilty pleas and received agreed-upon sentences. Mathews entered an *Alford*[1] plea to abduction and conspiracy to commit abduction on November 25, 2013.  Martin entered a guilty plea to both conspiracy charges on January 16, 2014.  Taylor pled guilty to murder as an accessory, abduction, and conspiracy to commit abduction on March 3, 2014.

Brown's court-appointed counsel obtained a psychological evaluation of Brown for competency to stand trial and sanity at the time of the offense.  The examiner found him competent to stand trial and sane, noting that his only findings of any significance were a few traits associated with paranoid personality disorder.  Counsel obtained a transcript of the preliminary hearing, requested funds to hire a forensic expert to evaluate an alleged digital recording of the incident, and filed a motion to suppress Brown's statement to Detective Eller of the Smyth County Sheriff's Department.  The statement was not audio recorded, but the detective wrote the statement and had Brown sign it. The interview was conducted October 22, 2012, in the emergency room of Johnson Memorial Hospital in Abingdon, where Brown was being evaluated for a gunshot wound to the groin, and before he was transported to the regional hospital in Tennessee for trauma surgery.  Hospital employees advised Detective Eller that Brown had been administered pain medicine through his IV about 10 minutes before the

---

[1]  An *Alford* plea is named after *Alford v. North Carolina*, 400 U.S. 25 (1970), the case upholding the constitutionality of a court accepting a plea from a person who does not admit committing the crime, but who believes the evidence would be sufficient to support a conviction and does not wish to risk a trial.

interrogation began.  The trial court found the statement voluntary and denied the motion to

suppress on April 23, 2014.  Brown's statement was consistent with his later trial testimony,

except for the last paragraph the deputy had written, which was different from the earlier part of

Brown's statement and from his trial testimony.  That last paragraph, likely the reason for the

suppression motion, read:

> I knew he was coming over, we had him to come over.  We had
> Allen's buddy call him to come over.  Allen hadn't had his heat
> pump running in two years.  It was my idea to call him to come
> over, so I could confront him.  I didn't want to get caught beating
> his ass on camera, then he pulled a gun so what do you do.

Comm. Ex. Mot. 1, April 23, 2014.

During the four-day jury trial that began April 28, 2014, the following evidence was

presented, in the light most favorable to the Commonwealth, the prevailing party:  Brown

believed that his fiancée, Melissa, was having a relationship with Williams, even though Melissa

denied such a relationship.  By his own testimony and the testimony of Matthews, Martin, and

Taylor, Brown wanted to confront Williams about the suspected relationship.  Coincidentally,

Williams lived with Taylor's former sister-in-law, Kimberly, who had custody of Taylor's

daughter; according to Brown, Matthews, and Martin, Taylor was upset because Kimberly and

Williams would not let Taylor visit her daughter.  Martin and Taylor were both living in

Matthews' home, temporarily, Taylor having lived there five months and Martin about three

weeks.  Brown and Matthews had been close friends for several years, and Brown met Taylor

and then Martin after each had moved into Matthews' home.  Matthews' heat pump had not been

working properly because it would run continuously, overheating the house and never shutting

off.  Martin called Williams and asked him to come over to see if he could fix the heat pump.

Only Martin testified that the phone call was a ruse to set Williams up, so that Brown and Taylor could confront Williams, and that the whole idea had been Brown's.  Martin even said that Brown gave him Williams' phone number.  Matthews and Taylor both testified that there was a real problem with the heat pump, and Matthews asked Taylor and Martin if either of them knew someone who could fix it for a low cost.  Martin recommended Williams.

According to both Matthews and Brown, they had plans to go crossbow hunting on Monday, October 22, 2012.  The Saturday before, Matthews said he spoke with Brown on the phone and mentioned that Williams was coming by to look at the heat pump Monday morning, which might delay or preempt the hunting trip.  Brown testified that this was the first he knew that Williams was going to be there.[2]  Brown denied that he had asked Martin, Matthews, or anyone else to lure Williams to the house.

Sometime between 7:00 and 8:30 a.m. on Monday, Brown showed up at Matthews' door with his hunting bag, dressed in camouflage, and with a holstered pistol strapped to his side.  Another pistol was in his hunting bag.  Once inside Matthews' house, Brown duct-taped his sheathed hunting knife to his leg, which he said was his usual custom before going hunting.  Brown told Matthews that he wanted to confront Williams about whether he was having an affair with Melissa before they went hunting.  Brown even said he had a digital recorder to catch the whole conversation, so he could confront Melissa with the evidence once Williams admitted the affair.  Brown denied that he had ever planned to assault or kill Williams, and he insisted that he had a gun for self-protection only, because he believed that Williams carried a pistol.  (Deer hunting with a gun was not in season.)

---

[2] Although Brown, the only defense witness to testify, testified after the other witnesses, his testimony is summarized before others' testimony for clarity of the narrative and to illustrate the differences between the testimony of each person involved.

4

By all accounts, Matthews went outside to do some work in the yard.  Around 10:00 in the morning, Brown went outside to the detached outbuilding/garage.  He left a walkie talkie inside the house, telling Taylor and Martin to let him know when Williams approached; he took the other walkie talkie to the garage.   In the garage, he looked for something appropriate with which to protect himself and found the axe handle with the head broken off.  He remained concealed in the garage, waiting for Williams to arrive.  His discussions with Taylor and Martin on the walkie talkies were captured on the digital recorder, and they told him when Williams' truck appeared.  While he waited in the garage, he also talked to himself, saying "My buddy Gary's wanting the truth.  You tell him to his face you f***ed her." (*Id*. At 78.)  Brown remained concealed from view and waited until Williams was away from his truck and facing the outdoor AC unit, so Brown could approach from behind.

Brown described the confrontation when he ran out, carrying the axe handle and wearing a camouflage mask on his face, and told Williams to get on the ground.  Williams began fighting to take the axe handle from him, and they wrestled on the ground.  Brown claimed that the only time Williams might have been struck by the axe handle was during that struggle.  When Brown fell to the ground after Williams got the axe handle away from him, he felt disoriented as he got up.  He thought he saw Williams standing up already, swinging something, but then he heard Taylor yelling at Williams to lie down on the ground.  He realized that Taylor was swinging something at Williams and hit him very hard.  Then he saw Williams pull out his gun. Brown backed up as far as he could, up to the fence, and then he felt pain in his groin and realized he had been shot.  He saw Williams point the gun at Taylor and shoot, so he pulled his gun to try and protect her.  He testified that he had been a top-rated marksman in the Army and was trying to shoot the gun out of Williams' hand, and he kept firing until Williams dropped the gun.  Then

he hollered to Matthews that he had been shot and needed to go to the hospital.  (Trial Tr. vol. 4, 11–88, May 1, 2014.)

Brown's micro-recorder was on the entire morning while they waited for Williams to arrive, during the shooting, and when Matthews drove Brown to the hospital.  The Commonwealth played the entire recording, over two hours long, for the jury.  During the first hour and forty-five minutes, Brown talked about sneaking up on Williams to confront him, making statements such as:

"I'm just going to back him up against the wall and ask questions."  (*Id.* at 76.)

"Intimidation, that's the main thing."  (*Id.*)

"This is what I'm going to use to f*** his car up."  (*Id.*)

"I'm going to pull this coat down over his arms and make him get on his knees—make sure he's not got any weapons on him."  (*Id.* at 78.)

"You block his view so he can't see me.  We don't want him to run.  He'll see me and take off."  (*Id.* at 81.)

Brown reluctantly acknowledged that those were his statements.  The digital recorder also picked up a conversation between Brown and Taylor, in which Taylor said she was going to do something to Williams if he refused to talk to her.

When Williams arrived, Matthews walked up to Williams' truck and introduced himself, explaining the problem with the heat pump.  Matthews testified that Martin came outside and joined them, and the three walked back toward the outdoor heat pump unit.  Matthews then went inside to turn on the breaker, so that Williams could see what the unit would do.  He saw Taylor in the living room and noticed she had a bat in the back of her jeans going under the back of her shirt.  After turning on the breaker (in his bedroom closet), Matthews went to the living room

and set the thermostat.  He looked out the window, and Williams confirmed that the unit was running.  (Trial Tr. vol. 3, 101–108, April 30, 2014.)  Then Matthews saw Brown in his camouflage, with a hat and face mask on, running toward Williams, waving an axe handle in his hand, and loudly yelling (with profanity) for Williams to get on the ground.  Williams, sounding shocked, said "What's going on?" and a few other profanities.  (*Id.* at 112.)  This exchange was also picked up on the recording that was played for the jury.

Matthews saw Williams grab for the axe handle, and Brown and Williams struggled over the handle, each trying to wrestle it from the other, and they moved through the grass until they were no longer in Matthews' line of sight.  Matthews then heard two gunshots and saw Brown coming back into his line of vision and backing up toward the fence, with his hand on his groin.  Brown said, "You shot me, mother f***er" and then pulled out his pistol and fired several shots.  (*Id.* at 75.)  Matthews still could not see Williams from his angle inside the house, and he did not see either Martin or Taylor during the commotion.

Taylor, who said that her memory was severely impaired because she had been using meth the morning of October 22, testified that she went out on the deck and down the stairs when she heard shouting.  When she got down there, she saw Williams and he pointed a gun at her.  She turned and ran, but tripped and fell, and he shot her in the left leg just below the buttock.  She heard a second shot and heard Brown yell and saw him grab his groin.  Then Brown pulled his gun and started shooting at Williams.  Taylor denied having any intention of confronting Williams that day and said she did not even know that he was the person living with her daughter and Kimberly.  She denied hitting Williams with the bat and said that her DNA must have gotten on the bat when she was cleaning up the yard a few days earlier and tossed it to the side.  She did

not remember telling Williams to get down on the ground but admitted that it was her voice on the recording saying "Get on the ground" just before the gunshots started.  (*Id.* at 165–210.)

Martin, in addition to testifying that luring Williams to Matthews' home was Brown's idea and that all four of them agreed to the plan, testified that Taylor and Brown both talked about getting Williams over there to confront him, having several phone conversations before that Monday.  Martin said he and Taylor both used drugs during that time, including the morning of October 22.  Martin claimed that they were romantically involved and staying in the same room at Matthews' home.  He testified that that he had known Williams back in school and they occasionally played pool together. About two weeks before the October 22 shootout, Taylor told him that Williams was the one living with the lady that had custody of Taylor's daughter and that Williams was the person who would not let her see her daughter.  (*Id.* at 211–219, 228–236.)

According to Martin's testimony, when he agreed to lure Williams over to the house, he thought that Brown and Taylor both just wanted to talk to him.  During the morning hours of October 22, he realized, from statements that Brown and Taylor were making, that things were getting out of control and that Brown and Taylor planned to do more than talk to Williams. Martin admitted that no one said anything about killing Williams, and Brown said he had the gun just in case he had to protect himself.  Based on Brown's plan to approach Williams by surprise, pin him to the wall, and not let him leave, he figured Brown was going to rough him up.  Martin also testified that Taylor had a small bat up her shirt sleeve before Williams arrived.  Despite this knowledge of weapons and escalation, he never called Williams to warn him or warned Williams when speaking with him while walking to the heat pump and waiting for Matthews to turn on the circuit breaker.  (*Id.* at 237–247.)

When Brown came running toward Williams, yelling for Williams to get on the ground, Martin testified that he ran under the deck and ran into Taylor, who was wearing a camouflage shirt, with her long hair stuffed under a baseball cap, and carrying the bat.  Taylor yelled at him to get out of the way.  Martin testified that Brown began hitting Williams with the axe handle, hitting him in the face a few times before Williams got hold of the stick and wrenched it away from Brown, falling onto one knee.  Brown also fell to the ground and immediately pulled out his gun.  Martin testified that Brown got up, standing over Williams, and shot him twice, the first gunshots that were fired.  Then Williams started shooting back.  Brown backed away toward the fence and continued firing at Williams.  Martin admitted that his initial statement to police was that Williams fired first and that he did not retract that position for several months.  While the shots were being fired by both men, Martin ran toward the front of the house to get away from the flying bullets.  Then he heard Brown holler for Matthews to get Brown's truck and take him to the hospital because he had been shot.  Taylor had been shot also, but only through the soft tissue as the bullet entered and exited the back side of her thigh under her butt.  (*Id.* at 220–223.)

Other than the testimony of co-defendants Matthews, Taylor, and Martin, the Commonwealth offered testimony from Major Bradford Shuler, Captain Joannou, Investigator Prater, and Investigator Eller, the officers from Smyth County Sheriff's Department who investigated Williams' death.  Captain Joannou diagrammed the scene, identifying the layout of the house, garage, deck, and fence, along with where Williams' gun, a bat, clothing, and other evidentiary items were found.  Brown's hunting bag, with a handgun inside, was in the garage. Five silver casings were found less than 10 feet from Williams' body, and three brass casings were found much further away.  No casings were found around the fence line.  Joannou also

noted recovering a walkie-talkie in the garage and another inside Matthews' house, after the search warrant was obtained.  (Trial Tr. vol. 1, 146–209, April 28, 2014.)

Investigator Prater executed a search warrant at Brown's home, where Matthews stated that he had returned Brown's belongings after he left Brown at the hospital.  Prater recovered bloody camouflage pants with a knife in a holster duct-taped to the pants, a 9 mm pistol with three unfired rounds in a 10-round magazine, gun holster, an ammo pouch with a digital recorder with a blinking red light (still recording) inside, and a charging station for hand-held radios. (Trial Tr. vol. 2, 44–63, April 29, 2014.)

Investigator Eller took statements from each of the four defendants, including a statement from Brown at Johnson Memorial Hospital on October 22, 2012, just an hour after the Sheriff's Office was notified about the shooting.  He described Brown as coherent during the statement, with no indication of intoxication from painkillers.  Eller admitted that the last paragraph of the statement taken from Brown was different from the earlier part of his statement; he said that Brown changed his version of events when Eller said he did not believe Brown's first version was truthful.  Because he had taken statements from all defendants, Eller was asked to identify the voices on the digital recording played for the jury, and he identified Brown, Taylor, and Martin as people speaking on the tape.  (*Id.* at 74–99.)  Kimberly Perkins Williams (who had lived with Williams for six years) identified Williams' voice on the recording.  (*Id.* at 100–101.)

Major Shuler assigned people to interview the defendants, secured the search warrant for Brown's residence and truck and for Matthews' house, and he forwarded several collected items to the lab for analysis. Shuler also arranged to have a computer crimes specialist from the Washington County Sheriff's Office extract the recording from Brown's digital recorder.  (Trial Tr. vol. 1, 115–144.)

James Blevins, a computer crimes detective from Washington County Sheriff's Office, testified that he made "read only" digital copies of the SD card in the digital recorder, using a forensic recovery of evidence device (FRED).  The SD card had five folders; three were empty, and one contained only deleted files.  The only folder with an active file was the recording of what happened the morning Williams was killed.  Blevins testified that he did not tamper with the SD card and that he did not detect any previous alterations to the recording.  (Trial Tr. vol. 2, 64–72.)

Bruce Koenig, an expert in audio, video, and image analysis, including analysis of gunshot sounds, was originally obtained by the defense, but testified for the Commonwealth about his examination of the digital recording.  Koenig held a B.S. in physics and math and an M.S. in forensic science.  He retired from the FBI after 25 years, during which time his primary assignment was technical forensic work with audio and visual recordings.  After retiring from the FBI, he started his own consulting company.  Koenig evaluated the digital recording from Brown's recorder and testified that it was a continuous, uninterrupted, and unaltered recording. He also testified that 5.036 seconds of the recording contained all the gunshots.  Based on the soundwaves generated from the shots, Koenig testified that the first seven shots were made from the same gun, fired in the same direction, within 2.8 seconds.  Shots 8, 11, and 12 were not fired from the same gun as shots 1 through 7, but all three came from a second gun.  Shots 9 and 10 were too close together to be differentiated.  He noted that the directional soundwaves were particularly important in identifying from where the shots came, because both guns were Kel Tec 9 mm pistols and, as such, would produce very similar soundwave images.  Based on the provided information regarding how many shots were fired from each gun, Koenig opined that

the first seven shots were fired from Brown's gun.  After his testimony, Koenig's written report was introduced into evidence.  (Trial Tr. vol. 3, 4–30.)

Robert Hart, a forensic scientist for the Virginia Department of Forensic Science for six years, testified as an expert in firearm and tool mark identification.  Prior to his employment in Virginia, he worked for the Miami/Dade County Police Lab in Florida for 35 years.  Hart test-fired the Kel Tec 9 mm pistol with 10-round magazine recovered from Brown's home and the Kel Tec 9 mm pistol with 12-round magazine recovered near Williams' body at the crime scene. Hart explained that the casing, a metal jacket around the bullet, is ejected when a bullet is fired. Further, as fully loaded, a pistol can have a full magazine, plus an additional cartridge in the chamber, such that Brown's gun could have fired as many as eight rounds, because only three unused cartridges remained in the magazine.  Seven unused cartridges remained in Williams' magazine.  Hart identified the silver casings recovered from the crime scene close to Williams' body as having been fired from Williams' gun.  The brass casings found further away had been fired from Brown's gun.  (*Id.* at 32–54.)

Melissa Hypes, a forensic biologist for the Virginia Department of Forensic Science, has a B.S. in biology and chemistry and a Ph.D. in biomedical science.  She had worked examining trace biological evidence for 8.5 years.  Williams could not be excluded as the provider of the touch DNA profile on his gun.  Neither Brown nor Williams could be excluded as contributors to the touch DNA mixture on the axe handle; that mixture included additional DNA that was not identified.  The was no blood on the axe handle.  Blood found on the grip of Brown's gun was analyzed, and Brown could not be excluded as the provider of the blood, based on the DNA analysis; the chance of someone other than Brown being the source of the blood was less than 1 chance in 6.5 billion.  Brown could not be excluded as the provider of the touch DNA on

Brown's gun.  Brown could not be excluded as the provider of DNA in the blood on the camouflage mask recovered from the scene, the camouflage pants, or the blood swabs from the driver and passenger seats of Brown's truck.  The bat had no blood on it, but Taylor could not be excluded as the source of the touch DNA on the bat.  Taylor could not be excluded as the provider of the blood DNA on her gray sweatpants.  (*Id.* at 141-164).

Finally, Dr. Amy Tharpe, Assistant Chief Medical Examiner, testified about her examination of Williams' body during autopsy.  Williams had a graze wound on his right hip; a bullet entered just below his right knee while he was in a squatting position, and exited behind the knee, re-entered the thigh and came to rest in a muscle in his pelvis; a bullet entry wound to his right upper chest, between two ribs, through his lung, exiting his back; a bullet entered his left chest near the shoulder at an angle, travelling between two ribs, through the heart and liver, and came to rest in the right side of his abdomen; a bullet entered through Williams' left elbow and fragmented, leaving bullet fragments lodged in the ulna; and finally, a bullet entry wound to the left of his scrotum that exited through a fleshy part of his side, which she called the love handle.  She also noted that he had a cut and bruise on his lip and an abrasion and bruise on his right ear, consistent with blunt force trauma.  She opined that his cause of death was multiple gunshot wounds with blood loss and penetration of the heart.  She identified the bullet that went through his heart and liver as the most quickly lethal shot, opining that all brain function was gone within 30 seconds to two minutes after that injury.  She further opined that it was unlikely Williams could have accurately fired a gun after these shots hit him.  (*Id.* at 276-340.)

Following the evidence, defense counsel moved to strike the evidence of conspiracy to commit murder.  After brief argument, the Commonwealth moved to dismiss that conspiracy charge, which the court granted.  The remaining four charges were submitted to the jury on May

1, 2014, after Brown's testimony.  After their deliberations, the jury ultimately returned a verdict against Brown on the four charges.  Following the evidence presented at the sentencing hearing—testimony from Freddie Williams (Williams' father), Angie Snaveley (Williams' sister), and Kimberly Perkins Williams (Williams' girlfriend) for the Commonwealth and then testimony from Brown, the jury deliberated again, returning with the following sentencing recommendation: 50 years for first-degree murder, five years for abduction, five years for conspiracy to commit abduction, and three years for use of firearm in the commission of a felony.  (Trial Tr. vol. 4, 201.)  The court ordered a presentence report and scheduled the sentencing hearing for a later date.

On June 19, 2014, Brown requested new counsel, which motion was denied.  On January 6, 2015, the court considered the presentence report and voluntary sentencing guidelines, recommended a sentence in the range of 32 years, and both sides offered testimony.  The Commonwealth offered victim impact testimony from Williams' father and girlfriend.  Brown offered testimony from his brother Scott, from his girlfriend Melissa Hall, and from co-defendant Allen Matthews, who had been friends with Brown since 1984.  The court ultimately imposed the sentence recommended by the jury and denied counsel's request that some of the time be suspended.  At Brown's request, new counsel was appointed to represent him on appeal.  (Sent. Tr. at 12–47, Jan. 6, 2015.)

On appeal to the Court of Appeals of Virginia, Brown raised five issues: (1) the trial court erred in denying his motion to suppress his statements given to Investigator Eller in the hospital; (2) the trial court erred in denying his *pro se* motion to fire his attorney and appoint a new one; (3) the trial court erred in not finding self-defense as a matter of law; (4) the trial court erred in failing to instruct the jury on elements of attempted abduction; and (5) the trial court

improperly instructed the jury on use of a firearm in the commission of a violent felony, Virginia Code § 18.2-53.1, by including conspiracy to commit abduction, which is not included in the statute as a predicate felony.  By per curiam opinion, the court denied his appeal.  *Brown v. Commonwealth*, No. 0218-15-3 (Va. Ct. App. opinion entered Oct. 21, 2015).  On Brown's request for a three-judge panel, the petition for appeal was again denied.  *Id.* (order entered Nov. 24, 2015).

Brown appealed to the Supreme Court of Virginia, which refused the petition on issues one through three above and dismissed issues four and five as procedurally defaulted, based on Rule 5:17(c)(1)(iii) of the Rules of the Virginia Supreme Court.  *Brown v. Commonwealth*, No. 151964 (Va. Aug. 18, 2016).  Brown did not seek certiorari in the United States Supreme Court.

On August 22, 2017, the Smyth County Circuit Court received a petition for a writ of habeas corpus mailed by Brown on August 17, 2017.  The court initially dismissed the habeas on May 11, 2018, signing an order prepared by the respondent which did not address all claims raised by Brown.  The Supreme Court of Virginia reversed the dismissal and remanded the matter to the circuit court for further proceedings.  *Brown v. Clarke*, No. 180757 (Va. April 15, 2019).  The circuit court addressed all 11 claims of ineffective assistance that Brown raised and again denied the petition and dismissed the case.  *Brown v. Clarke,* No. CL17-000675-00 (Smyth Co. Cir. Ct. Sept. 11, 2019).  Brown appealed to the Supreme Court of Virginia, which this time refused his petition.  *Brown v. Clarke,* No. 191633 (Va. April 7, 2021).

In his § 2254 petition, timely received in this court on May 14, 2021, Brown raises the following claims:

(1)     The trial court denied Brown's due process rights by failing to find self-defense as a matter of law.

(2)     The trial court violated Brown's due process rights by convicting him of abduction when the evidence was insufficient to support the conviction.

(3)     The trial court denied Brown his due process rights by failing to grant his motion for new counsel.

(4)     The trial court denied Brown's due process rights by failing to suppress Brown's statements to Investigator Eller.

(5)     The trial court denied Brown's due process rights by failing to instruct the jury on the elements of attempted abduction.

(6)     The trial court denied Brown's rights by giving an erroneous jury instruction, allowing the jury to convict him of using a firearm in the commission of a violent felony (Virginia Code § 18.2-53.1) if he used such firearm in the conspiracy to commit abduction, when conspiracy is not a predicate felony under the statute.

(7)     Ineffective assistance of trial counsel in misstating facts of the case to the audio expert, and upon which the expert based his opinion.

(8)     Ineffective assistance of trial counsel in failing to have the blood on a leaf at the crime scene examined.

(9)     Ineffective assistance of trial counsel in failing to have the bat examined for fibers.

(10)     Ineffective assistance of trial counsel in failing to have Williams' watch and IC cards analyzed for DNA

(11)     Ineffective assistance of counsel in failing to try to find the missing shell casings at the scene.

(12)     Ineffective assistance of counsel in failing to take crime scene photos.

16

(13)   Ineffective assistance of counsel in failing to compare the original digital recording with the copy played for the jury.

(14)   Ineffective assistance of counsel in failing to call four witnesses who would have testified that Martin said he was going to lie at Brown's trial.

(15)   Ineffective assistance of counsel in failing to challenge overly broad search warrant, seizure of items not listed, and failure to knock and announce.

(16)   Ineffective assistance of counsel in failing to cross examine Investigator Prater about the crossbow at Brown's residence.

(17)   Ineffective assistance of counsel in failing to object to the incorrect jury instruction on use of a firearm in the commission of a violent crime.

(18)   Ineffective assistance of counsel in failing to request jury instructions on lesser included offenses of second-degree murder and manslaughter.

(19)   Ineffective assistance of counsel in failing to request jury instruction on attempted abduction.

(20)   Ineffective assistance of counsel in failing to move to separate witnesses during the suppression hearing.

(21)   Ineffective assistance of counsel in failing to object to introduction of Brown's statement on the grounds that it had been altered by Investigator Eller.

(22)   Ineffective assistance in cross-examination of the Chief Assistant Medical Examiner.

(23)   Ineffective assistance of counsel in failing to request concurrent sentences or sentence reduction.

(24)   Ineffective assistance of counsel in failing to object to prosecutorial misconduct.

## II.  DISCUSSION

### A.  Procedural Standards

A federal court may grant a petitioner habeas relief from a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Federal courts reviewing constitutional claims adjudicated on the merits in state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  The federal court must presume that the state court's factual findings are correct, and this presumption can be overcome only "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

A federal district court reviewing a § 2254(a) petition is also limited by the separate but related doctrines of exhaustion, procedural default, and independent and adequate state law grounds.  The standard of review and these procedural doctrines promote the principles of finality, comity, and federalism, recognizing a state's legitimate interests in enforcing its laws, preventing disruption of state judicial proceedings, and allowing states the first opportunity to address and correct alleged violations of a state prisoner's federal rights.  *Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991).

To exhaust his claims, as required by 28 U.S.C. § 2254(b)(1)(A), a petitioner must present his federal constitutional claims to the highest state court, on the merits, before he is entitled to seek federal habeas relief.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  This can be done on direct appeal from the conviction or in the state habeas proceedings, so long as

the state's highest court is given the opportunity to address the issue.  Further, the petitioner must

present to the state court the same operative facts and the same controlling legal principles that

he seeks to present to the federal court.  *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995); *Kasi v.

Angelone*, 300 F.3d 487, 501–02 (4th Cir. 2002).  Failure to do so "deprives[s] the state courts of

an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732.

A separate but closely related issue is the doctrine of procedural default.  If a state court

has clearly and explicitly denied a petitioner's claim based on a state procedural rule that

provides an independent and adequate ground for the state court's decision, that claim is

procedurally defaulted for purposes of federal habeas review.  *Breard v. Pruett*, 134 F.3d 615,

619 (4th Cir. 1998).  A state procedural rule is independent if it does not depend on a federal

constitutional ruling, and it is adequate if it is firmly established and regularly applied by the

state court.  *Yeatts v. Angelone*, 166 F.3d 255, 263–64 (4th Cir. 1998).  A claim that has not been

presented to the highest state court and would be procedurally barred as untimely or successive if

the petitioner tried to present the issue to the state court now is considered simultaneously

exhausted and defaulted.  *Bassette v. Thompson*, 915 F.2d 932, 936–37 (4th Cir. 1990).

Before a federal habeas court will consider a procedurally defaulted claim, the prisoner

must show both cause for the default and actual prejudice resulting from the claimed federal

violation.  *Coleman*, 501 U.S. at 750.  Cause for procedural default requires the existence of

some objective factor, external to the defense and not reasonably attributable to the prisoner.  *Id.*

at 756–57.  To show prejudice to overcome procedural default, a petitioner must show that the

claimed violation worked to his "actual and substantial disadvantage, infecting his entire trial

with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982).  If

the defaulted claim alleges ineffective assistance of trial counsel, the Supreme Court has adopted

19

a special test for cause and prejudice, set forth in *Martinez v. Ryan*, 566 U.S. 1, 13–15 (2012): (1) the claim of ineffective assistance of counsel must be a "substantial claim;" (2) the "cause" is the lack of counsel or ineffectiveness of counsel under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984); (3) the state post-conviction proceeding was the first time ineffective assistance of counsel was raised; and (4) the state post-conviction proceeding was the first one in which petitioner was actually or effectively allowed by state law to raise the claim.

## B.  Analysis of Exhausted Claims

Of Brown's 24 claims, 16 have been properly exhausted, and eight have been expressly procedurally defaulted or deemed exhausted and defaulted.  The court will address the properly exhausted claims first, bearing in mind that the court must defer to the state court's decision on such issues unless the state court's findings of facts are unreasonable or its decision is contrary to, or an unreasonable application of, existing federal law as determined by the United States Supreme Court.

### 1.  Sufficiency of the Evidence (Claims 1 and 2)

The Supreme Court has recognized that sufficiency of the evidence to support a conviction beyond a reasonable doubt is a constitutional claim arising under due process. *Jackson v. Virginia*, 443 U.S. 307, 322 (1979).  A federal habeas court can grant relief on such a claim only if the evidence at trial, in the light most favorable to the prosecution, is such that no rational trier of fact could have found guilt beyond a reasonable doubt.  *Id.* at 319, 324.  That is the same standard of review used by the courts in Virginia to determine whether a motion to strike the evidence should have been granted or whether a defendant was entitled to a favorable judgment as a matter of law.  "In reviewing the sufficiency of the evidence to support a conviction, we must . . . regard as true all the credible evidence favorable to the Commonwealth

and all fair inferences that may be drawn therefrom." *Caison v. Commonwealth*, 663 S.E.2d 553, 561 (Va. Ct. App. 2008).

Brown raised and properly exhausted his sufficiency of the evidence claims in his direct appeal. He asserts that the trial court should have found as a matter of law that he acted in self-defense and that the trial court should have found the evidence insufficient to support his conviction for abduction. Because the Supreme Court of Virginia summarily denied his petition for review of these issues, the court must "look through" that denial to the last reasoned opinion to determine the reasonableness of the state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (holding that federal habeas court is to presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground"). Accordingly, the court will apply the deferential standard of review prescribed by § 2254(d) in reviewing the Court of Appeals' opinion.

     a. *Self-defense as a matter of law*

Although undisputed facts may establish self-defense as a matter of law, whether a defendant has established that he acted in self-defense is usually a question of fact for the factfinder. *Caison*, 663 S.E.2d at 561–62. Considering the evidence in the light most favorable to the Commonwealth, the appellate court found sufficient evidence to negate the self-defense claim and support the jury's verdict. Specifically, the court noted that Brown "ran toward Williams, screaming at him to get on the ground. . . . [while] wielding an axe handle and wearing a mask." *Brown v. Commonwealth*, No. 0218-15-3, slip. op. at *7. Brown and Williams struggled over the axe handle, and Brown struck Williams with the handle before Williams wrested the handle from Brown's hand. Based on Martin's testimony, Brown then fired two

shots at Williams while Williams was on the ground before Williams drew a gun and fired back.

All that evidence is in the trial testimony, as previously summarized.  Thus, the state court's

determination of the facts supporting the jury's verdict is reasonable.  The testimony of one

witness, if believed, is sufficient to sustain a guilty verdict.  *Bryant v. Commonwealth*, 393

S.E.2d 216, 220 (Va. Ct. App. 1990); *United States v. Arrington*, 719 F.2d 701, 705 (4th Cir.

1983).  The state court's application of the law was also reasonable, in that due process is

violated only when there is no evidence upon which a reasonable factfinder could rely.  *Jackson*,

443 U.S. at 319, 324.

   b. *Sufficiency of abduction evidence*

   Virginia Code § 18.2-47(A) defines abduction as:

> Any person who, by force, intimidation or deception, and without
> legal justification or excuse, seizes, takes, transports, detains, or
> secretes another person with the intent to deprive such other person
> of his personal liberty . . . shall be deemed guilty of abduction.

*Id.*  Again, viewing the evidence in the light most favorable to the Commonwealth, the appellate

court concluded that Brown's statement on the digital recording that he intended to sneak up on

Williams and pull his coat over his head and arms to restrain him was sufficient to establish

intent to deprive Williams of his liberty.  Further, by running at Williams and screaming for him

to get on the ground, while wielding the axe handle, and then struggling over the handle with

Williams until they both fell to the ground, Brown in fact deprived Williams of his liberty.

   The court's factual conclusions are reasonable based upon the evidence in the record and

are fully supported by the law.  As the Court of Appeals of Virginia recently explained,

Virginia's abduction statute essentially prohibits the exercise of control over a person, without

legal justification, to deprive him of his liberty.  *Walker v. Commonwealth*, 870 S.E.2d 328, ___

(Va. Ct. App. 2022).  In *Walker*, a bank robber struck a customer when the robbery began, and

the customer immediately laid himself flat on the floor; in upholding the abduction conviction—even though the robber had not knocked the customer to the floor or even ordered him to get down—the court found that the robber's intimidation was intended to cause and in fact caused the customer to remain on the floor for the duration of the robbery. *Id.*

Given the Commonwealth's construction of abduction, other evidence also amply supported the abduction conviction. Martin's testimony that Williams was lured to the home under false pretenses is sufficient evidence of abduction by deception, if believed by the factfinder. Tricking someone to get into a car under the false pretense of taking her to buy narcotics constituted abduction. *Jerman v. Director of the Dep't of Corr.,* 593 S.E.2d 255, 259 (Va. 2004). *See also Smith v. Commonwealth*, 697 S.E.2d 14, 15–16, 19 (Va. Ct. App. 2010) (upholding conviction for abduction when defendant lured victim to his bedroom by hollering to her on the sidewalk that his girlfriend, a friend of the victim, was in defendant's bedroom and wanted to talk to her).

Because the state court's decision was based on a reasonable determination of facts and a proper application of *Jackson*, the federal court is required to defer to the state court's decision on these issues.

### 2. Denying Appointment of New Counsel Before Sentencing

Brown raised this claim in his direct appeal. Accordingly, the court "looks through" the Supreme Court of Virginia's refusal of the appeal to the last reasoned opinion, entered by the Court of Appeals. *Ylst*, 501 U.S. at 803. The appellate court held that the trial court did not abuse its discretion in denying Brown's request for new counsel. The court based its decision on the following factual findings: Brown did not request new counsel until weeks after the jury trial ended, and the scheduled sentencing was fast approaching; realistically, continuance would

require postponement of the sentencing hearing; Brown expressed no dissatisfaction with his attorney until after guilty verdicts were returned; and counsel had provided a vigorous defense throughout a four-day jury trial. The record supports these factual findings, and the state court's decision was not based on an unreasonable determination of the facts.

The state court stated that the constitutional right to counsel does not guarantee that an indigent defendant will be represented by counsel of his own choosing; the Constitution requires only that he be provided effective assistance of counsel. That is a correct statement of the law as stated by the United States Supreme Court. *Christeson v. Roper*, 574 U.S. 373, 377 (2015); *see also Miller v. Johnson*, No. 7:06-cv-00611, 2007 WL 1725617, at *21 n.17 (W.D. Va. 2007). Further, an indigent defendant can demand a different lawyer only with good cause. *Miller*, 2007 WL 1725617, at *21 n.17. That Brown did not like his attorney is not good cause. The Sixth Amendment does not guarantee a meaningful relationship between an accused and his counsel. *Morris v. Slappy*, 461 U.S. 1, 14 (1983). The state court's finding that the trial judge did not abuse her discretion is a reasonable application of federal law, and this court cannot grant relief on this claim.

### 3. Trial Court's Denial of Suppression Motion

Brown sought suppression of his statement to Investigator Eller on the grounds that his statement was involuntary. He exhausted this issue by pursuing it on direct appeal. This court looks to the reasoning of the Court of Appeals of Virginia, the last reasoned opinion in the case. *Ylst*, 501 U.S. at 803. The ultimate question of whether a confession was voluntary is a legal determination, not a factual one. *Miller v. Fenton*, 474 U.S. 104, 110 (1985). Subsidiary factual questions, such as a person's words or demeanor, however, are factual questions subject to the presumption of correctness in § 2254(e)(1). *Miller*, 474 U.S. at 112.

The state appellate court correctly stated the standard applied by the United States Supreme Court in determining the voluntariness of a confession.  The test of voluntariness examines whether a confession was "the product of an essentially free and unconstrained choice [or whether] . . . his will has been overborne and his capacity for self-determination critically impaired."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).  This court must now determine what factual findings the state court made and how that court applied this standard to those facts.

The appellate court found the following facts: Eller, an investigator with 19 years of law enforcement experience, questioned Brown in the hospital emergency room, where Brown was awaiting treatment for the gunshot injury to his groin.  Nurses were coming in and out of the room while Eller was present.  Just before the interview, Brown had been given pain medication.  Eller did not notice any slurred speech or other speech defect, and Brown did not appear confused or disoriented.  In fact, Eller testified that Brown seemed eager to tell his side of the story.  Eller made no threats to Brown to obtain his statement.  Virginia State Police Sergeant Daniel Price, State Trooper Richie Maddox, and Captain Michael Lomans of the Smyth County Sheriff's Office were all present, corroborating that Brown did not appear intoxicated or confused and that Eller did not use threats or coercive tactics during the interview.  Further, at the suppression hearing, Brown testified that he tried to be honest and forthcoming during the interview.  Based on the trial court's finding that the four law enforcement officers were credible and had years of experience, combined with Brown's admission that he tried to be honest and forthcoming, the appellate court concluded that the confession was voluntary.

Brown has not introduced any evidence or argument to rebut the factual determinations of credibility and the observations of the officers; his only argument is that the wrong legal

conclusion was drawn, because being in medical distress alone can be enough to overcome a person's free will.  However, a state court's decision is an "unreasonable application" of federal law only if the ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  The question is not whether this court believes the state court's decision is correct, but whether the decision was unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  Courts in this circuit have found and upheld the voluntariness of confessions made by defendants in a hospital, even when medicated with narcotics following surgery and/or traumatic injury. *See, e.g., United States v. Cristobal,* 293 F.3d 134, 141 (4th Cir. 2002); *United States v. Wilder*, 304 F. Supp. 3d 464, 470–71 (S.D. Md. 2018); *United States v. Pendelton*, No 3:96CR1, 1996 WL 35051997 at *1–3 (N.D. W. Va. 1996).  Accordingly, this court cannot conclude that the state court's decision was unreasonable.  This claim must be dismissed.

### 4. Ineffective Assistance of Counsel

Brown has raised several claims alleging ineffective assistance of counsel.  When reviewing counsel's performance, courts apply a highly deferential standard.  A petitioner must show that (1) counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment *and* (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1994).  Petitioner must satisfy both prongs of the test.  Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms." *Id.* at 688.  The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy

decisions.  *Id.* at 689–90.  The *Strickland* standard is "doubly deferential" in the context of a federal habeas petition, because the deferential standard of review required by § 2254 overlaps with the deferential standard under *Strickland*.  *Woods v. Etherton*, 578 U.S. 113, 117 (2016); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).  In other words, federal courts on habeas review are to give the benefit of the doubt to both the state court and the defense attorney.  *Woods*, 578 U.S. at 117.

To establish prejudice under *Strickland*, a petitioner must show that there was "a reasonable probability that the outcome of the proceedings would have been different," which means "a probability sufficient to undermine confidence in the outcome.  *Strickland*, 466 U.S. at 694.  Prejudice under *Strickland* subsumes the harmless error standard.  *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).  These are the standards which will be used to evaluate the state habeas court's resolution of Brown's ineffective assistance of counsel claims.

### a.  *Ineffectiveness in trial preparation*

*Claim 7.*  In claim seven, Brown alleges that trial counsel erroneously informed the expert in audio recording analysis and analysis of gunshot sounds, Bruce Koenig, that Brown had fired eight shots, whereas Brown maintains that he only fired seven.  Brown raised this issue in his state habeas, which the state court addressed as issue one, and it has been properly exhausted. As in the direct appeal, the Supreme Court of Virginia refused to hear Brown's habeas appeal, so this court looks through to the circuit court opinion as the last reasoned habeas opinion.  *Ylst*, 501 U.S. at 803.

The state habeas court found that trial counsel's performance was not deficient, noting that Brown has not proved he fired only seven shots.  The trial testimony of Robert Hart, the firearms specialist from the Virginia Division of Forensic Science, testified that Brown's gun

could hold 10 rounds in the magazine plus an additional round in the chamber, for a total of 11 rounds.  When the firearm was recovered, only three rounds remained in the gun.  Thus, if the weapon was fully loaded, Brown could have fired eight shots, leaving three rounds remaining in the magazine.

Further, the state court found that Brown suffered no prejudice from counsel's statements to Koenig.  Koenig's scientific analysis of the sound patterns produced by the gunshots led him to conclude that the first seven shots (not eight) were fired from the same weapon.  Based on his review of the ballistics information from Hart, Koenig concluded that those shots had to be fired from Brown's gun, because Williams had too many rounds left in his magazine to have fired seven shots.  Whether Brown had also fired an eighth shot later in the confrontation would make no difference to Koenig's opinion, which was based on scientific evidence, not on Brown's description of how the incident occurred.

This court cannot say that the state court's determination of deficiency and prejudice under *Strickland* was unreasonable.  Therefore, the court cannot grant relief on claim seven.

*Claims 8 and 9.*  In claims eight and nine, Brown alleges that his attorney was ineffective in failing to seek forensic examination of the blood on a leaf recovered from the crime scene and forensic examination of the bat for fibers.  Both claims were raised in his state petition (claims 4 and 10 respectively in the state court decision) and have been properly exhausted.

The state habeas court found that counsel was not deficient in failing to have the bloody leaf examined.  Brown asserts that the blood was his blood and would have established how far away he was from Williams when he fired his shots.  As the state habeas court observed, counsel established through cross-examination of the medical examiner that she could not say how far away Brown was from the victim when the shots were fired; she could only say that he had to be

28

further back than two or three feet because there were not stippling and powder burn marks, which would be associated with an extremely close shot.  Further, no one disputed that the red substance on the leaf was blood; proving that the blood was Brown's was not likely to make a difference in the outcome of the case.  Brown did not stay in one place throughout his struggle with Williams or afterwards, nor can one say that the leaf was not tracked on a shoe or blown by the wind to arrive at the location where it was found.  Proof of Brown's blood on a leaf is not proof that he was standing on the leaf when he was shot or when he shot Williams.  Thus, he has shown only speculation and conjecture, not prejudice, from failing to have the leaf examined.  Without prejudice, the court need not address the deficiency prong.  The court cannot grant relief on claim eight.

Brown now alleges that the bat should have been analyzed for fibers from Williams' clothing.  In the state petition, Brown mentioned fibers, but did not say which fibers he sought.  Without that information, the state habeas court could not determine whether there had been any deficient performance.  A petitioner cannot make out a successful claim for failure to investigate evidence without a specific explanation of what the investigation would reveal.  *Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990).  The state court observed that the bat had been forensically analyzed, at counsel's request, for organic evidence, revealing Taylor's DNA.  Dr. Hypes, the forensic biologist, also noted that no blood was on the bat.  Even if the bat had fibers from Williams' clothing, that would not change the outcome of Brown's trial.  Matthews and Martin both testified about Taylor having a bat and being upset with Williams; further, Taylor pled guilty to murder as an accessory.  Therefore, the trial in 2014 was not about Taylor's role in the altercation.  The trial was about Brown's actions.  Brown fired several shots, at least five of which entered Williams's body and another one grazed his hip.  The cause of death was

penetration of the heart and bleeding out, secondary to gunshot wounds.  Whether the bat had fibers on it would not have changed the outcome of the case.

Because the state court's finding of no deficient performance was reasonable, and because Brown suffered no prejudice from failure to examine the bat, he cannot prevail on this claim.  The court will deny claim nine.

*Claim 13.*  Brown alleges that counsel was ineffective for failing to compare the copy of the audio played for the jury with the original audio recording on his digital recorder.  The state habeas court found no deficient performance because the expert at trial, originally hired by defense counsel, testified that the recording was not altered.  Further, Brown has presented no evidence that the tape had been altered.  His "proof" is that he, Matthews, and Martin all have different memories of the event than are captured on the recording.  That is not proof of tampering or alteration.  Indeed, the witnesses had different memories of the events from each other, too, which can happen even when completely honest people recall the same event differently.

Brown believed the recording had been altered and asked his attorney to investigate that.  His attorney did so.  The expert, with more than 25 years of experience, examined the recording and determined that no alteration had occurred.  Counsel did not disregard Brown's concerns; counsel is not able to create evidence that does not exist.  Given the scientific validation of the recording's accuracy, the dispute between the recording and the witnesses must be explained by deception or, even more likely, memory error.  Scientific literature has thoroughly documented the inaccuracy of a person's memory for details of a traumatic or emotional event; while the memory of the gist of the event is quite clear, a person's memory of the specific details of a traumatic or emotional event are substantially less accurate than their memory of event details

less laden with emotional content.  Sven-Ake Christianson & Elizabeth F. Loftus, *Memory for Traumatic Events*, *in* APPLIED COGNITIVE PSYCHOLOGY, VOL. 1 225–239 (Elizabeth Loftus ed., 1987); Elizabeth A. Kensinger & Daniel L. Schacter, *Memory and Emotion, in* HANDBOOK OF EMOTIONS 601–617 (3rd ed. Michael Lewis, Jeannette M. Haviland-Jones, & Lisa Feldman Barrett eds., 2008).

The state habeas court's finding that counsel's performance was not deficient is more than reasonable; it is amply supported by the evidence.  The court cannot grant relief on claim 13.

*Claim 15.*  Brown alleges that counsel was ineffective in failing to challenge an overly broad search warrant, the seizure of items not named in the warrant, and the failure to knock and announce.  The state habeas court ruled that Brown failed to establish deficient performance by counsel and that the search warrant was valid, validly executed, and not overbroad.  Although legal analysis explaining the conclusion was sparse, the state court is not required to provide reasons for its decision; if there is any reasonable basis supporting the court's decision, a federal habeas court cannot grant relief.  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).  A review of applicable federal law supports the reasonableness of the state habeas decision.

When an officer executes a facially valid search warrant in good faith, then the search is reasonable under the Fourth Amendment.  *United States v. Leon*, 468 U.S. 897, 920–22 (1984).  This is true even if the warrant is later determined to be invalid, with certain exceptions that do not apply to this case.  *Id.*  To be facially valid, a warrant must describe with particularity the place to be searched and the things to be seized.  *Id.* at 923.  The warrant provided a detailed description of Brown's residence, the place to be searched, including the address and description of the mobile home; the warrant specifically included the curtilage and described the wood

porches on the front and back of his home.  The warrant also provided a detailed list of things for which to search, including firearms, bullets, shell casings, blood, and documents showing ownership of the property.  The magistrate reasonably determined probable cause to issue the warrant, based on the officers' interviews of all four co-defendants.  Matthews had acknowledged that he took Brown's clothing, guns, and other items to Brown's home after taking Brown to the hospital.  The items listed in the warrant were clearly relevant to the proper investigation of Williams' death.  The warrant was not overbroad, given the information provided to the magistrate and the nature of the offense for which evidence was being collected.

The "knock and announce" rule has been part of the common law since before the framing of the United States Constitution.  *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995).  As generally stated in the caselaw, the rule requires police to knock and announce their presence prior to entering a dwelling, unless doing so under articulable circumstances of the particular case would inhibit effective investigation of the crime, would be dangerous, or would be futile.  *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). In determining whether a search is reasonable, compliance with the knock and announce requirement is a factor to consider, but it is not the only factor.  *Wilson*, 514 U.S. at 936.  The test is reasonableness under the circumstances.  *Id.*  In discussing the long history of the rule in Anglo-American jurisprudence, the Court cited *Pugh v. Griffith*, 112 Eng. Rep. 681, 686, 7 Ad. & E. 827, 840–41 (K.B. 1838).  The court in *Pugh* held that the need to knock and announce is "obviated" when no one is present on whom a demand can be made.  *Id.*  If the home was entered without knocking and announcing, it would be because the officers knew that Brown, the homeowner, was in the hospital, and no one was there to allow them into Brown's trailer to execute the warrant.

Further, even if the officers had committed a clear violation of the knock and announce rule, the exclusionary rule is inapplicable to knock and announce violations.  *Hudson v. Michigan*, 547 U.S. 586, 594 (2006).  The purpose of the knock and announce rule is to avoid confrontation with a surprised resident, to protect the home from physical damage, and to protect the dignity and privacy of residents; all this is accomplished by giving the resident the opportunity to comply with the law and avoid the destruction of property that comes with a forcible entry.  *Id.*  The purpose of knock and announce is *not* to prevent the government from seeing or taking evidence described in the warrant to be executed.  *Id.*

Finally, Brown's complaint about the seizure of his digital recorder is without merit.  The recorder was in an ammunition pouch, clearly falling within the scope of the warrant to search for bullets, which would be the normal contents of an ammunition pouch.  Although the digital recorder was not listed in the warrant, when an officer is lawfully present in a location and discovers an item, and it is immediately apparent to the officer that the item may be evidence of a crime, the object is subject to seizure under the plain view doctrine.  *Coolidge v. New Hampshire*, 403 U.S. 443, 465–68 (1971) (first articulating the plain view doctrine); *Horton v. California*, 496 U.S. 128, 130 (1990) (holding that "inadvertence" of discovery is not necessarily required for a plain view seizure).  When the officer looked in the ammunition pouch, still attached to Brown's belt and bloody clothing, and saw the red light flashing on the recorder, he realized that the item was a recorder *and that it was still recording*.  Knowing that the confrontation between Brown and Williams was to be recorded by Brown and replayed for his girlfriend, it was immediately apparent to the officer that the recorder may contain evidence of the crime, making seizure of the item appropriate and lawful.  Cutting off the recorder merely preserved the battery and prevented the possibility of the recording being recorded over.

Although Brown complains of the recorder being seized, and he found suspicious the two-month delay in getting a warrant to listen to the recording, the police did exactly what they were supposed to do. *Cf., Riley v. California*, 573 U.S. 373, 401 (2014) (holding that a warrant is generally required before a search of a cell phone's contents, even when the phone has been lawfully seized). Law enforcement had a great deal of evidence to examine and process on this case, and undoubtedly, the case was not the only one they had. Waiting two months to get a warrant and listen to the recording was not unreasonable.

This somewhat lengthy analysis of Fourth Amendment law cites familiar cases that are well known to criminal defense attorneys. The court has gone through this analysis to demonstrate why Brown's attorney would reasonably decide not to spend time challenging the search warrant when there were other areas of the case that he could work on more effectively. Decisions pertaining to trial strategy, arguments to make, and evidence to object to are generally committed to the sound discretion of the attorney. *Gonzalez v. United States*, 553 U.S. 242, 248–49 (2008). Absent a demonstration of objective ineffectiveness, the attorney's decision to file—or not file—a motion will not be second-guessed by a habeas court. *Id.* Without evidence that a reasonable defense attorney would have believed that a motion attacking the warrant had a remote chance of being granted, then counsel's performance was not deficient; "counsel is not required to engage in the filing of futile motions." *Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005) (internal citation omitted). Likewise, because such a challenge was highly unlikely to succeed, Brown has not been prejudiced by the failure to challenge the search warrant. The state habeas court's decision that counsel's performance was not deficient is a reasonable determination of the facts and application of the law, and the court will dismiss claim 15.

    *b.  Ineffectiveness during trial*

34

As noted previously, tactical decisions of counsel during trial are given great deference. A reviewing court strongly presumes that all significant decisions were made in the exercise of reasonable judgment. *Strickland*, 466 U.S. at 690. Brown's claims in numbers 14, 16, 18, 20, 21, 22, and 24 allege ineffective assistance of counsel during various aspects of the trial itself, and each of these claims was presented to the state habeas court and has been fully exhausted. On these claims, the court will review the circuit court's habeas decision for reasonableness, as this was the last reasoned decision on these claims. *Ylst*, 501 U.S. at 803.

*Claim 14.* Brown alleges that counsel was ineffective because he failed to call as witnesses four inmates who would testify that Martin planned to perjure himself on the stand to get a better deal. The state habeas court found that counsel's decision was not deficient performance, noting that the inmate statements were inconsistent with physical evidence at the scene and with the digital recording. Counsel's decision whether to call a witness is a strategic decision that demands "the assessment and balancing of perceived benefits against perceived risks" and is a decision "to which we must afford enormous deference." *United States v. Terry,* 366 F.3d 312, 317 (4th Cir. 2004). The Fourth Circuit Court of Appeals has recognized that a decision not to call jail inmates as witnesses is a reasonable strategic decision. *United States v. Terry*, 366 F.3d 312, 316–17 (4th Cir. 2004). The state habeas decision reasonably applied the presumption in favor of the defense attorney, and the court will dismiss claim 14.

*Claim 16.* Brown alleges that counsel was ineffective in cross examining Investigator Prater about the crossbow found in Brown's home. The state habeas court found no deficient performance on this issue, noting that the presence or absence of a crossbow had minimal relevance to the case. Choosing questions to ask on cross-examination is an essential part of counsel's tactical strategy, which should not be second-guessed by the court under *Strickland*.

*Hunt v. Nuth*, 57 F.3d 1327, 1332–33 (4th Cir. 1995).  Brown's second-guessing of counsel's cross-examination amounts to grading the quality of cross-examination, rather than determining the reasonableness of counsel's performance.  *Id.* at 1333.  The state court's findings of fact and conclusions of law on this claim are not unreasonable, and the court must dismiss claim 16.

*Claim 18*.  Brown alleges that counsel was ineffective in failing to request jury instructions on the lesser included offenses of second-degree murder and manslaughter.  The state habeas court found that counsel's performance was reasonable, not deficient.  The state court noted that the jurors must find that Brown abducted Williams before they could convict him of first-degree felony murder; if they did not find that he abducted Williams, then Brown would have been acquitted of murder.  However, if lesser-included instructions had been given, he could have been convicted of second-degree murder or other homicide even if the jury did not find an abduction.  The state court's factual findings are reasonable, as is the state court's application of federal law.

While a defendant is entitled to a lesser-included offense instruction if he requests it at trial, *United States v. Baker*, 985 F.2d 1248, 1259 (4th Cir. 1993), failure to request an instruction on a lesser-included offense can be reasonable trial strategy.  *Washington v. United States,* 291 F. Supp. 418, 442 (W.D. Va. 2003).  *Accord Look v. Amaral*, 725 F.2d 4, 9 (1st Cir. 1984) ("Defense counsel may well have felt that, on the evidence, the jury would be more likely to convict on manslaughter than to acquit, but if given a choice only between a murder conviction and acquittal that an acquittal was more likely."); *Hooks v. Ward*, 184 F.3d 1206, 1234 (10th Cir. 1999) ("[I]n the context of instructions on lesser included offenses, we see particular strategy reasons why a defendant might not want to present the jury with a

compromise opportunity.").  Because this is a reasonable trial strategy, the habeas court must presume that counsel had a strategic reason for his decision.  Claim 18 will be dismissed.

*Claim 20.*  Brown alleges that trial counsel was ineffective because the witnesses were not sequestered during the motion to suppress hearing.  The state habeas court denied the claim because Brown made no showing that the witnesses were not sequestered.  Further, Brown did not show how the alleged failure to sequester altered the testimony or the outcome of the suppression hearing.  To establish a viable claim for ineffective assistance of counsel, a petitioner must demonstrate prejudice, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.  It is not enough to show speculative, conceivable effects on the outcome; rather, the errors must be so serious as to deprive the defendant of a fair trial.  *Harrington*, 562 U.S. at 104. The state habeas court's decision is reasonable in every respect, and the court must dismiss claim 20.

*Claim 21.*  Brown alleges that counsel was ineffective in failing to object to Investigator Eller's introduction of Brown's "altered" statement. This assertion ignores the fact that counsel filed a motion to suppress the statement and keep it out of evidence, which is the primary way to object to a defendant's statement.  Further, Eller testified that the statement was not altered, while Brown denied making the statements in the last paragraph of the statement.  This dispute was a factual matter for the jury to decide. *Bethel Inv. Co. v. City of Hampton*, 636 S.E.2d 466, 469 (Va. 2006) ("The Virginia Constitution guarantees that a jury will resolve disputed facts, and that has been the jury's sole function from the adoption of the Constitution to the present time."). Accordingly, the state habeas court's decision that counsel's performance was not deficient is reasonable.  The court will dismiss claim 21.

*Claim 22.* Brown alleges that counsel was ineffective in cross-examining the medical examiner. The state habeas court found that counsel's cross-examination was not deficient; rather, the court noted that counsel ably established that the medical evidence did not place Brown directly over the victim, as Martin testified, and that she could not tell how far away the shooter was from Williams when the shots were fired. As in claim 16, choosing questions to ask on cross-examination is an essential part of counsel's tactical strategy, which should not be second-guessed by the court. *Hunt,* 57 F.3d at 1332–33. The state habeas court's decision was a reasonable application of federal law, based on a reasonable determination of the facts. Accordingly, the court will dismiss claim 22.

*Claim 24.* Brown alleges that counsel was ineffective for failing to object to "prosecutorial misconduct," i.e., disparaging statements about the witness and misrepresentations of in the prosecution's questions to witnesses and arguments to the jury. Brown specifically identifies prosecution statements about (1) Brown's research on Big Foot in the forest, (2) asking questions about statements Brown made in a phone call he denied, (3) waving the bat around during Taylor's testimony like he was going to hit her with it, (4) denying the existence of the crossbow during his closing argument, even though deputies had a picture of the crossbow, along with the other evidence, and (5) allegedly referring to Brown as a "son of a bitch," which was not reflected in the transcript. The state habeas court found as a matter of fact, based on the record, that the prosecutor did not refer to Brown as a son-of-a-bitch, and that Brown admitted making some of the statements the prosecutor asked about in a phone call with Melissa. The court also found no evidence that the prosecutor handled the bat in a threatening manner. Finally, the state court held that the misstatement about the crossbow was insignificant because the crossbow had nothing to do with the events that ended in Williams' death. These factual determinations are

presumed correct under § 2254(e), and they are reasonable.  Clearly, counsel cannot be deficient for failing to object to events that did not happen (misconduct allegations 2, 3, and 5).  Likewise, the court's observation that the crossbow comments were irrelevant in the overall scheme suggests that Brown suffered no unfair prejudice from the prosecutor's comment, even if it was improper.

The state habeas court did not address the allegation that the prosecution made disparaging remarks about Brown's hobby of investigating Big Foot sightings.  Brown's explanation for some of the items in his bag, including the walkie-talkie two-way radios, duct tape, rope, and guns, was that he used these items to mark areas of potential Big Foot sightings and to protect himself in the event of being attacked by one.  That made the prosecutor's commentary a valid position on Brown's credibility.  Even if it were outside the bounds of propriety in the closing argument, defense attorneys may reasonably choose not to object during a prosecutor's closing argument for a variety of tactical reasons, including because jurors get irritated by objections and because defense counsel may not want to call attention to comments about which he wants the jury to forget.  These are strategic judgments that trial attorneys make routinely, and failure to object to closing arguments of this nature do not rise to a claim for ineffective assistance of counsel.  *Evans v. Thompson*, 881 F.2d 117, 125 (4th Cir. 1989).

For the reasons stated above, claim 24 will be dismissed.

## C.  Analysis of Defaulted Claims

### 1.  Claims that the State Court Found to be Defaulted

As previously noted, if a state court has clearly and explicitly denied a petitioner's claim based on a state procedural rule that provides an independent and adequate ground for the state court's decision, that claim is procedurally defaulted for purposes of federal habeas review.

*Breard*, 134 at 619.  Brown's fifth and sixth claims in this petition were raised in Brown's direct appeal, namely that the trial court violated due process by failing to instruct the jury on the elements of attempted abduction and erred by instructing the jury that he could be convicted for use of a firearm in the commission of conspiracy to commit abduction.  As the Court of Appeals of Virginia noted, Brown did not raise these issues in the trial court.  The court declined to consider the claims under the "ends of justice" exception for issues first raised on appeal, finding that the circumstances did not warrant their consideration in the ends of justice.

On the failure to instruct the jury on the elements of attempted abduction, because first-degree murder required a finding that the killing occurred in connection with the abduction or attempted abduction of Williams, the court noted that the jury convicted Brown of abduction, and that conviction supported the first-degree murder conviction, such that any error in failing to instruct the jury on attempted abduction would have been harmless.  Likewise, the jury was instructed to convict if Brown possessed a firearm in the commission of murder, abduction, or conspiracy to commit abduction.  Even though conspiracy was erroneously included in the instruction, Brown was convicted of murder and abduction, either one of which, by itself, would support the firearm conviction, so any error would have been harmless, and the court did not consider the issue.

On further appeal to the Supreme Court of Virginia, the court dismissed those two claims for failure to comply with Va. S. Ct. R. 5:17(c)(1)(iii).  Failure to comply with Rule 5:17(c) has long been recognized as an independent and adequate state law grounds for dismissing a claim.  *Mueller v. Angelone*, 181 F.3d 557, 584 (4th Cir. 1999).  Accordingly, both claims have been procedurally defaulted based on independent and adequate state law grounds, which renders them procedurally defaulted for purposes of federal habeas review.  *Breard*, 134 F.3d at 619.

To overcome procedural default, a petitioner must show both cause for the default and actual prejudice caused by the claimed violation.  Brown has not articulated any good cause for the procedural default, but even if he did, he cannot establish prejudice.  As the Court of Appeals of Virginia noted in refusing to apply the "ends of justice" exception, the errors alleged were harmless in this case.  Brown was convicted of only one count of using a firearm in the commission of a violent felony, and that charge was supported by either the murder or the abduction convictions.  Further, because he was convicted of abduction, that is the felony that supported his first-degree murder conviction.  Therefore, he was not prejudiced by any violation, and he cannot overcome his procedural default.  Claims 5 and 6 will be dismissed.

### 2.  Exhausted and Defaulted Claims

Brown has raised six claims in his § 2254 petition that have not been presented to the state court for consideration, claims 10, 11, 12, 17, 19, and 23.  Further, he cannot now present them to the state court because he has already filed a habeas petition that was determined on the merits, and second petitions are not permitted when based upon facts that were known or reasonably should have been known when the first petition was filed; further, the time for filing a state petition has expired.  Va. Code § 8.01-654.  Accordingly, these claims are considered simultaneously exhausted and defaulted.  *Bassette*, 915 F.2d at 936–37.  Each of these claims alleges ineffective assistance of counsel.  Accordingly, the four-pronged test set forth in *Martinez* determines whether Brown can overcome his default.  566 U.S. at 13–15.

Three of the *Martinez* prongs are clearly met in this case.  Brown had no attorney in his state habeas proceedings.  Although Brown has not alleged *Martinez*, one can safely assume that lack of counsel prevented him from identifying the most meritorious issues for collateral attack.  Under Virginia law, habeas proceedings are the first time that ineffective assistance of counsel

claims can be raised; they cannot be raised on direct appeal. *Hall v. Commonwealth*, 515 S.E.2d 343 (Va. Ct. App. 1999). Brown's state habeas petition is the first time he raised ineffective assistance of counsel issues. The only remaining question for each defaulted claim is whether the claim is substantial. A substantial claim is one that has some merit. *Martinez*, 566 U.S. at 14. Having some merit does not mean that the claim entitles the prisoner to habeas relief; it means only that the federal court consider the merits of a claim that otherwise would be defaulted. *Id.* at 17. For the reasons discussed below for each claim, the court finds that none of Brown's defaulted claims is "substantial," and he has not overcome his procedural default.

    *a. Failing to have Williams' watch and IC cards analyzed for DNA (claim 10)*

    Whether a claim for ineffective assistance of counsel has merit requires the court to apply the deferential standard of *Strickland*. In other words, a petitioner must demonstrate that counsel's performance was defective *and* that such performance prejudiced the defense. Brown argues that DNA analysis of the watch and IC cards would corroborate his testimony "that he and Williams struggled over the broken axe handle down through the yard until Taylor struck him with the bat while the two men were near the garage." (Pet. 31, Dkt. No. 1.) However, no one disputed that the watch was Williams' watch or that the IC cards belonged to Williams. DNA evidence would provide nothing that was not already known. DNA would not prove that Taylor's bat knocked the watch off. All eyewitnesses testified that Brown and Williams struggled over the axe handle. Because DNA analysis of these items would not add any evidential value to the case, counsel was not deficient in failing to pursue this line of investigation. Further, there is no prejudice from not having the DNA, as no one contested ownership of the watch and IC cards. Therefore, this claim lacks merit.

    *b. Failing to find the missing shell casings at the crime scene (claim 11)*

Brown alleges that the four missing shell casings would further corroborate that he was standing near the fence when the exchange of gunfire occurred, not directly over Williams. Brown acknowledges that the three casings from his weapon were found away from Williams' body and shell casings, and that two of Brown's casings were already found by the fence. Other than Martin, no one testified that Brown stood directly over Williams, not even the medical examiner. The issue is not how far away Brown was when he shot, but whether he was excused by self-defense for shooting Williams seven or eight times. Brown has offered no evidence that a reasonable attorney would have tried to find the remaining casings, knowing that law enforcement officers had already searched the area. Thus, he has not shown deficient performance. Further, he has not demonstrated any prejudice; because Brown's shell casings had already been found by the fence, additional casings in the same location would have been merely cumulative. Failure to obtain cumulative evidence does not demonstrate prejudice. *Huffington v. Nuth*, 140 F.3d 572, 581 (4th Cir. 1998). Accordingly, this claim is not substantial.

### c. *Failing to take crime scene photos (claim 12)*

The Commonwealth introduced seven photos of Matthews' property, showing all sides of the house and the garage and breezeway. In addition, other photos were taken showing the location of Williams' body and gun, shell casings, and other evidentiary items in the yard, in relation to the house. Finally, the Commonwealth introduced a diagram of the scene, and defense counsel capably utilized several copies of that diagram to have witnesses mark the location of each event leading up to the confrontation. Additional photos would have been cumulative, and failure to obtain cumulative evidence does not demonstrate prejudice. This claim also has no merit.

### d. *Failing to object to the incorrect jury instruction on use of a firearm (claim 17)*

Counsel's failure to object to the jury instruction constituted deficient performance.  By simply reading the statute, counsel could have seen that conspiracy was not an enumerated offense.  Virginia Code § 18.2-53.1 reads:

> It shall be unlawful for any person to use or attempt to use any . . . firearm or display such weapon in a threatening manner while committing or attempting to commit murder . . . or abduction.

*Id.*  Annotations of cases interpreting the statute are included in the Virginia Code, including several cases holding that "Under the plain language of Code § 18.2-53.1, there can be no conviction for use or attempted use of a firearm when there has been no commission of one of the predicate offenses enumerated in that statute."  *Jay v. Commonwealth*, 659 S.E.2d 311, 321 (Va. 2008); *see also Bundy v. Commonwealth*, 259 S.E.2d 826, 828 (Va. 1979); *Johnson v. Commonwealth*, 458 S.E.2d 599, 602 (Va. Ct. App. 1995).  Counsel's "ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance."  *Hinton v. Alabama*, 571 U.S. 263, 274 (2014); *United States v. Carthorne*, 878 F.3d 458, 466 (4th Cir. 2017).

However, deficient performance is only one part of the inquiry.  Brown must also demonstrate prejudice, which he cannot do.  Under Virginia Code § 18.2-53.1, use of a firearm in commission of abduction is a crime and use of a firearm in the commission of murder is a crime.  Had the Commonwealth charged him with two counts of using a firearm in the commission of a felony, his conviction of both charges would have supported two convictions. *Morris v. Commonwealth*, 321 S.E.2d 633, 636 (Va. 1984).  The Commonwealth charged him only once for violating § 18.2-53.1; although the jury was improperly instructed that conviction of murder, abduction, or conspiracy to commit abduction would support the conviction, the inclusion of conspiracy to commit abduction was harmless.  Clearly, the jury convicted him of

44

using the firearm in connection with murder, shooting Williams six times. For the same reason

that the Court of Appeals of Virginia found that the ends of justice did not require the court to

consider the due process objection to the jury instruction, the lack of prejudice to Brown prevents

this claim from being substantial.

> e. *Failing to request a jury instruction on the elements of attempted abduction (claim 19)*

Brown claims that counsel should have requested an instruction on the elements of

attempted abduction because Instruction No. 4 instructed the jury that one of the elements of

first-degree murder was "that the killing occurred in the commission of or attempt to commit

abduction as that offense is separately defined." Trial Tr. vol. 4, 109. Brown was not charged

with attempted abduction, however, so a jury instruction on attempted abduction was not only

unnecessary, but it would have been confusing and misleading to the jury. For that reason alone,

there is no deficient performance in failing to request an attempted abduction instruction. If the

jury had found Brown not guilty of abduction but guilty of first-degree murder under the murder

instruction, then Brown might have a valid argument that the jury had not been adequately

instructed or had not understood the instructions. The jury found Brown guilty of abduction.

That fully satisfied the predicate offense element of the murder charge, rendering the reference to

attempted abduction irrelevant. Just as the Court of Appeals of Virginia found no reason to

consider the due process claim on this issue under the ends of justice, because there is no

prejudice to Brown as a result of the failure to request an attempted abduction instruction, this

claim is not substantial, and Brown has not overcome his default of the issue.

> f. *Failing to request concurrent sentences or a sentence reduction*

Brown faults counsel for not requesting a sentence reduction or concurrent sentences. He

fails to credit counsel with filing a written motion to suspend part of the sentence in order to

bring the jury's recommendation in line with the substantially lower sentencing guidelines. Counsel renewed that argument at the sentencing hearing in January 2015, but the court denied the motion.  Sent. Tr. at 46.  In the context of a homicide case, a request for sentence reduction versus a request to suspend part of the sentence is simply a matter of semantics, the choice of words used on the caption of the motion.  As previously noted, when reviewing claims of ineffective assistance of counsel, courts must presume that counsel's strategic decisions fell within the range of reasonableness under prevailing professional norms when the decisions were made, not based on hindsight.  *Strickland*, 466 U.S. at 689–90.  Which motions to file and arguments to make when requesting modification of a sentence fall within the range strategic decisions.  *Gonzalez v. United States*, 553 U.S. 242, 248–49 (2008).  Brown has offered nothing to overcome the presumption that counsel's strategy was reasonable.

Nor has Brown demonstrated any prejudice from failing to make a motion for concurrent sentences or sentence reduction.  If the court was not willing to suspend a portion of the 63 years, allowing Brown to serve less time as long as he did not get into trouble again, it is illogical to think the court would be willing to reduce the time outright, with no suspended time to invoke if Brown violated the terms of his suspended sentence. This claim is without merit and does not overcome Brown's procedural default.

### III.  CONCLUSION

Because the state court decisions on Brown's exhausted claims are based on a reasonable determination of facts and reasonably apply federal law, the court must dismiss those claims. Brown has not made the required showings of cause and prejudice for his procedurally defaulted claims, nor has he established that his unexhausted claims of ineffective assistance of counsel are

substantial within the meaning of *Martinez*.  Accordingly, the court will grant the respondent's motion to dismiss.

Further, when issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability.  Fed. R. Gov. § 2254 Cases 11(a).  A certificate of appealability may only issue if the movant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The movant must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000).  In the context of a procedural ruling, the movant must demonstrate both that the dispositive procedural ruling is debatable and that the action states a debatable claim of the denial of a constitutional right.  *Gonzales v. Thaler*, 565 U.S. 134, 140–41 (2012).  Brown has not made such showings in this case.

An appropriate order will be entered.

Entered: May 11, 2022.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge